JOURNAL ENTRY AND OPINION
This is an appeal from an order of Visiting Juvenile Court Judge Timothy Cotner that awarded permanent custody of Paul Seese, Jrs.'s five-year-old son to the Cuyahoga County Department of Child Family Services (CCDCFS). Seese claims that several evidentiary errors, the denial of an opportunity to review abuse referral records, the misconduct by his son's Guardian ad Litem (GAL), and lack of jurisdiction require reversal. We affirm but remand for clarification of the order.
From the record we glean the following: B.S., born March 8, 1996, is the son of Seese and the fourth child of Jennifer Pacovsky.[1] The couple had an on-again, off-again relationship that began in 1994 and eventually resulted in marriage in May 1998. On June 19, 1998, CCDCFS social worker Cassandra Washington appeared at their apartment to investigate an anonymous allegation that E.M and B.S. were being neglected.[2] She discovered B.S. sleeping in a locked bedroom, on a mattress without sheets, and wearing a dirty diaper, and set up a case plan with the couple to correct the unsanitary living conditions in the apartment.
In July 1998, Seese was assaulted by Mrs. Seese's brother, Robert, and Joseph Fasone, who had been Seese's best man, and was forced to leave the couple's apartment. Fasone then moved in, and began an abusive relationship with Mrs. Seese which created for E.M. and B.S. an environment filled with frequent domestic violence, substance abuse, and exposure to uninhibited sexual activity. People made allegations of sexual abuse of the children by Seese, E.M.'s father and the father of Mrs. Seese's other children. In September 1998, Laura Winner, of CCDCFS's Domestic Assessment Services, visited the family to determine what services might be needed. E.M., then almost age four, stated without prompting, that she thought Ms. Winner had visited to investigate how Paul had put his fingers in [her] pee-pee. CCDCFS moved for, and was granted emergency custody and then temporary custody of the two children. CCDCFS placed B.S. and E.M. with the foster family where they remain today.[3]
Case plans were put into effect for the various parents, with an amended plan that required Seese to obtain a drug and alcohol assessment, which is a test and diagnostic tool used to determine whether substance abuse treatment is warranted; to undergo domestic violence counseling and to receive one-on-one psychotherapy. As the parties worked, in varying degrees, to complete the case plan objectives, Fasone murdered Mrs. Seese on October 2, 1999, under circumstances not described in this record.
In May 2000, CCDCFS moved for permanent custody of E.M., B.S. and N. At the hearing on the motion on September 25, 2000, Seese appeared with counsel, E.M.'s father appeared pro se, and Fasone, incarcerated, appeared through counsel and voluntarily relinquished his parental rights to N. Judge Robert Ferreri continued the hearing until January 9, 2001. Judge Cotner, now assigned to the case, denied E.M.'s father's eleventh-hour pro se motion for a continuance. Seese did appear with counsel and argued his case for B.S., but E.M.'s father did not appear.
At the hearing, Ms. Washington testified that Seese, following a psychological evaluation, had been ordered to undergo domestic violence counseling and individual psychotherapy in April 1999, but began domestic violence counseling with therapist Lou Pitschmann only in September 1999, and concluded it in January, 2000. Seese also began individual psychotherapy, which was on-going at the time of the hearings, in September 2000. She also reported that after three attempts,[4] he complied with the agency's order for a drug and alcohol assessment in 2000, and that the report indicated treatment was not warranted.
Ms. Washington opined, however, that Seese had not satisfactorily completed his case plan objectives because his domestic violence counseling focused on him as a victim, rather than a perpetrator, that his psychotherapy was insufficient because it, too, focused on him as a passive victim, and that he adamantly denied all allegations that he had sexually abused any child. Moreover, she claimed he was not serious about his programs because, after being ordered to do so, he took too long to begin them.
Over objection, Ms. Washington further testified that Laura Winner told her that E.M. had made the statement alleging abuse by Seese, and also that Mrs. Seese, at that time, told Ms. Winner it was quite possible that he had molested her daughter. Also over objection, she testified that an unidentified social worker, investigating charges of the sexual abuse of E.M. and B.S. by Seese, had told her that, while the charge could not be substantiated, she felt that something improper had occurred. Additionally, she stated E.M.'s father told her that he had seen his daughter acting out sexual behavior and that she had tried to inappropriately touch his fiancee's daughter, a child of comparable age. She concluded by stating that the children were adjusting well to life with the foster family and have closely bonded with them.
Ms. Winner testified about her visit to the apartment and recounted the statements made to her by both E.M. and Mrs. Seese.
Maureen Falkenstine, a licensed social worker who has been E.M.'s therapist for the past two years, testified that, while attempting to provide therapy and guidance, through play therapy, she non-confrontationally interacts with the child in order to observe her behavior and note any unsolicited information she might offer. She stated, without objection, that the child told her that she wants to live with the foster family, and that Seese, B's Daddy, had molested her after a bath and exposed himself. She testified that the child's initially severe behavioral problems had improved, although they still existed, and that it would be completely devastating to E.M. if she and B.S. were separated from each other or the foster family.
Bobbi Lee Gallagher, B.S.'s current therapist, succeeded Dr. Vesna Kutlesic in May, 2000 in this capacity. She testified about her observations of B.S. and his treatment records, in addition to her own diagnosis and that of Dr. Kutlesic. She stated that B.S. suffers from Post-Traumatic Stress Disorder, an anxiety disorder caused by witnessing an immediate threat of death or serious harm to a loved one, which results in terrible nightmares and makes him, when under stress, extremely anxious and upset and provokes ensuing violent behavior. Ms. Gallagher, after observing these behaviors, and taking into account the content of B.S.'s nightmares (which often involve a bloody hand with red fingernails reaching to get him), referred him to psychiatrists at University Hospitals for possible diagnosis of Childhood Early-Onset Bipolar Disorder, an extremely serious mood disorder characterized by rapidly cycling, extreme mood swings.
She further testified that the child never brings up his natural father and becomes agitated and changes the subject if she ever mentions him. She related that the child has adjusted well to his foster family, does not want to leave, and that tearing him away from that environment could make him dangerous to himself or to others. She also said that ever since he learned, inadvertently, of the permanent custody hearing, the benefits that he had received from therapy disappeared, and that he is now more nervous and uncontrollable than ever, although he does try to remain calm because he is aware that his nervousness is a problem.
The foster mother testified that when the children first came to live with her, B.S. had severe nightmares every night and consistently wet his bed and that E.M. was very bossy but insecure, but that they were gradually adjusting to their new home. While B.S. seemed to be calming down a bit as he continued his therapy, she testified that his behavior regressed to its beginning level of severity once he learned of the custody hearing. She related that both children call her and her husband Mom and Dad and that they enjoy the company of her three biological children as well as each other and baby N. She stated that, if permitted, she and her husband were willing to adopt both E.M. and B.S.
Cindy Lotarski, a friend of the late Mrs. Seese who testified on Seese's behalf, stated she has always known him to be good with children and that B.S., on the few times she had seen him with Seese, seemed to be happy to see his father. Through her testimony, she painted a very clear portrait of Mrs. Seese as a woman who kept a very unstable home for her children and described the alcohol abuse and domestic violence that existed in both the Pacovsky-Seese and Fasone households. She recounted how she witnessed the children watching the Playboy Channel late at night, that Mrs. Seese had threatened to beat the children and blame their injuries on Seese, and that Mrs. Seese had told the children to accuse J.O's and A.O's father of molesting them.
Thomas Supan, a psychotherapist, testified that Seese has been emphatic and consistent in denying that he sexually abused any children, and that Seese is frustrated with the court system and views himself as a victim in both these proceedings and his life in general. Because he had only five therapy sessions with Seese prior to the hearing, he was unable to form an opinion as to whether Seese's treatment is having any positive effects or whether he would be an able parent. He admitted the sessions were based solely from information Seese had provided and he had not yet had the opportunity to review his CCDCFS file.
Seese, who was then unemployed and lived with his parents, testified that his problems with his late wife, Fasone, and his general life situation stem from the fact that he is too passive, or does not want to start trouble. He professed his love for his son and his willingness to accept the responsibility to care for him, E.M. and N. if the preservation of that group as a family unit was necessary for him to gain custody of his son. He admitted that he had been a custodial parent for only about eight months of his son's life.
At the conclusion of the hearing, the judge stated that he was going to find that the evidence did not demonstrate that Seese had molested E.M. or his son. His journal entry stated that clear and convincing evidence supported a determination that the best interests of the children dictated that permanent custody of E.M. and B.S. be granted to CCDCFS. It also found that, while neither child had been abandoned, clear and convincing evidence of the following factors indicated that they could not be placed with their respective fathers within a reasonable time:
 (1) The absence of a relationship that the children had with their respective parents;
 (2) The wishes of the children, as expressed by the children or their guardian ad litem;
 (3) The fact that the children had been in foster care for twelve of the twenty-two months preceding the hearing; and,
 (4) The need for legally secure placement of the children and whether that can be achieved without placement with the agency.
Seese claims ten assignments of error in this appeal.
 I. WHETHER THE EXPERT TESTIMONY AND OPINION IS RELEVANT WHEN IT IS NOT STATED TO BE WITHIN A REASONABLE DEGREE OF PROFESSIONAL CERTAINTY.
Seese argues that, because the opinion testimony of Ms. Falkenstine and Ms. Gallagher preferring placement of his son with the foster parents was not phrased in terms of its probability and medical certainty, the judge should not have considered it. At the hearing, however, no objection was made to it and, instead, both witnesses were cross-examined about their qualifications and ability to render opinions. While there can be no serious argument that their opinion testimony was relevant in determining where B.S. should live, Seese's real argument is that this testimony was inadmissible. Failure to object to the admission of evidence at trial or hearing, with a short statement of the grounds of the objection, however, constitutes a waiver of objection upon appeal.[5] This assignment of error is not well taken.
 II. WHETHER A DECEASED DECLARANT'S HEARSAY IS ADMISSIBLE.
Seese contends that statements made by his late wife, which implicated him in the alleged sexual abuse of E.M. and/or his son, should not have been admitted by the judge and that such error mandates reversal.
Evid.R. 804(B)(5) carves out an exception to the general rule that hearsay, or an out-of-court statement offered by another to prove the truth of the matter asserted,[6] is inadmissible[7] in circumstances where the declarant of the original statement is dead at the time of trial. Under Evid.R. 804(B)(5), the hearsay statement of a decedent may be admissible at trial or hearing if:
 [t]he statement was made by a decedent * * *, where (a) the estate or personal representative of the decedent's estate * * * is a party, and (b) the statement was made before the death * * *, and (c) the statement is offered to rebut testimony by an adverse party on a matter within the knowledge of the decedent * * *.
The statements objected to were not offered in rebuttal but were submitted by CCDCFS as part of its case-in-chief as evidence of Seese's unfitness as a parent. It is also undisputed that Mrs. Seese's estate is not a party to this custody proceeding, a logical impossibility, and the statements are clearly inadmissible. The second assignment of error is sustained.
 III. WHETHER THE HEARSAY TESTIMONY OF A CASEWORKER IS ADMISSIBLE.
Here Seese challenges the admission of a statement made by Ms. Washington reiterating comments made to her by an unidentified social worker that improprieties had occurred despite the fact that such charges involving Seese could not be substantiated, and the statements that E.M.'s father had made regarding the improper conduct exhibited by his daughter.
CCDCFS offers no exceptions to the hearsay rule that would have permitted the introduction of such testimony over objection. The third assignment of error is well taken.
 IV. WHETHER HEARSAY EVIDENCE FROM MINOR CHILDREN IS ADMISSIBLE.
 V. WHETHER OTHER HEARSAY EXCEPTIONS GOVERN OVER EVIDENCE RULE 807.
Under Evid.R. 807(A), the statement of a child under the age of twelve alleging sexual or physical abuse may only be permissibly admitted as the hearsay testimony of another if:
 (1) The court finds that the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness that make the statement at least as reliable as statements admitted pursuant to Evid. R. 803 and 804. The circumstances must establish that the child was particularly likely to be telling the truth when the statement was made and that the test of cross-examination would add little to the reliability of the statement;
* * *
 (2) The child's testimony is not reasonably obtainable by the proponent of the statement;
 (3) There is independent proof of the sexual act or act of physical violence; and
 (4) At least ten days before the trial or hearing, a proponent of the statement has notified all other parties in writing of the content of the statement, the time and place at which the statement was made, the identity of the witness who is to testify about the statement, and the circumstances surrounding the statement that are claimed to indicate its trustworthiness.
The determination of the admissibility of such hearsay allegations of abuse by a minor must be made by a judge at a hearing on the record, and he must state the basis for the ruling made.[8]
It is uncontroverted that no hearing was held to satisfy the mandates of Evid.R. 807 and, to the extent such testimony by Ms. Washington and Ms. Winner was admitted over objection, the fourth and fifth assignments of error are well taken.
 VII. WHETHER CHILD ABUSE REFERRAL RECORDS ARE CONFIDENTIAL AND NOT SUBJECT TO DISCOVERY BY THE DEFENDANT.
Ms. Washington used CCDCFS hot-line investigatory records to refresh her recollection about why the welfare of E.M. and B.S. became an agency issue. Seese contends he should have been able to review those records to cross-examine her about the contents, but the judge incorrectly found them to be confidential and he was further denied a requested judicial in camera review of the records so that any confidential information could be redacted and the balance of the unprivileged information made available.
Evid.R. 612 states, in relevant part,
 * * *[I]f a witness uses a writing to refresh his memory for the purpose of testifying, either:
(1) while testifying; or
 (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing. He is also entitled to inspect it, to cross examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. If it is claimed that the writing contains matters not related to the subject matter of the testimony the court shall examine the writing in camera, excise any portions not so related, and order delivery of the remainder to the party entitled thereto. Any portion withheld over objections shall be preserved and made available to the appellate court in the event of an appeal. * * *
Thus, an adverse party has an absolute right to examine a writing which a witness uses to refresh his or her recollection while testifying.[9]
R.C. 149.43, dealing with public access to the records of the state or its subdivisions, defines a public record as * * * any record kept by a public office * * *, including county offices.[10] R.C. 149.43(A)(2) defines a confidential law enforcement record as:
 * * * any record that pertains to a law enforcement matter of a criminal, quasi-criminal or administrative nature, but only to the extent that the release of the record would create a high probability of disclosure of the following:
* * *
 (b) the identity of an information source or witness to whom confidentiality has been reasonably promised, or information which would compromise the identity of a confidential information source or witness to whom confidentiality has been reasonably promised;
 (c) specific confidential investigatory techniques, procedure or work product; or
 (d) information which would endanger the safety of a crime victim, witness, confidential source or law enforcement officer.
According to R.C. 5153.17, a county children's services agency must maintain records of investigations of families, children and foster homes, which are to be considered confidential but shall be open to inspection upon written permission of the head of the agency.
The Ohio Supreme Court has made it clear that general public policy favors disclosure of public records; where part of an otherwise protected record may be confidential, but such information can be redacted from the record in order to lawfully make available unprotected information, a judge is to allow discovery of such information after an in camera review of the record and the deletion of information prohibited from disclosure.[11]
Combining the procedure in Evid.R. 612 with the general policy favoring disclosure of public, non-protected records, we hold that the judge was required to conduct an in camera review of the investigatory record used by Ms. Washington to refresh her recollection at hearing. This is particularly true because here, CCDCFS itself brought the record into the hearing so that the witness could refresh her recollection of its contents, and then raised the shield of confidentiality only after it had, itself, used it at the hearing. The failure by the judge to inspect the document in camera and, if possible, edit out those parts statutorily prohibited from disclosure was error.
 VIII. WHETHER THE GUARDIAN AD LITEM PROVIDED INEFFECTIVE ASSISTANCE AS AN ATTORNEY FOR THE CHILDREN.
Seese complains that the GAL failed to fully investigate the children's circumstances, was not present for the entirety of the hearing, barely participated at all at the hearing, failed to interview all relevant parties, including him, and otherwise issued a recommendation to the court that did not represent the best interests of the children.
R.C. 2151.28.1(I) outlines the duties of a guardian ad litem of a dependent child as follows:
 The guardian ad litem for an alleged or adjudicated abused, neglected, or dependent child shall perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services provided the child by the public children services agency or private child placing agency that has temporary or permanent custody of the child, and shall file any motions and other court papers that are in the best interest of the child.
The GAL was not appointed as the children's attorney, so we note at the outset that his conduct will be reviewed based on his duties under R.C. 2151.28.1.
In response to Seese's initial motion to have him removed in April 2000, the GAL represented that his activities had included interviewing Mrs. Seese, her parents, E.M., Fasone, and the children's counselors and working with the assigned social workers. His recommendation to the judge stated that the best interests of the children required commitment to the permanent custody of CCDCFS, that the respective fathers were not suitable guardians and had not, as of the hearing date, completed their case plans, and that the children were being cared for in a more stable, nurturing environment in their foster home. We cannot say that his performance ignored his duties to his wards or the court. * * * [W]hen parents cannot establish prejudice arising from the misfeasance, or nonfeasance, of a guardian ad litem, it is harmless error.[12] The GAL's concurrence with the position of CCDCFS, however, does not represent prejudice, and Seese has not articulated how he has been prejudiced in light of the testimony of his son's therapist and the overall record which supports the GAL's recommendation. This assignment of error is not well taken.
 IX. WHETHER A GUARDIAN AD LITEM'S FAILURE TO PRODUCE A REPORT PRIOR TO TRIAL IS INAPPROPRIATE AND WHETHER IT VIOLATES THE RIGHT TO CONFRONT ONE'S ACCUSERS.
Seese did not object to the oral representation of the GAL that his report would not be filed until the day after the hearing in violation of R.C. 2151.414(C),[13] and such failure to object to the tardiness of a GAL recommendation and report at hearing constitutes waiver of the issue on appeal.[14] This assignment of error lacks merit.
 X. WHETHER THE MOTION FOR PERMANENT CUSTODY SHOULD HAVE BEEN DISMISSED AS THE TRIAL OCCURRED TWO YEARS AFTER THE DATE OF FILING FOR EMERGENCY CUSTODY.
Seese submits that the custody hearing, held more than two years after CCDCFS moved for emergency custody of his son, violated the statutory time limits set forth in R.C. 2151.353 and .415 and should not have gone forward at all. He contends that, under In re Omosun,[15] a decision from the Eleventh District, such a failure to adhere to the deadlines established by Chapter 2151 of the Revised Code divests a judge of the ability to entertain a motion for permanent custody, absent the filing of a new complaint.[16] However, the Ohio Supreme Court, in In re Young,[17] held that the passing of statutory deadlines contained in R.C. 2151.353(F) does not divest the judge of jurisdiction over any order needed for the protection of a minor child, over whom the court retains jurisdiction until the child reaches majority.[18]
Given the finding that the statutory time limitations contained in R.C. 2151.353(F) are directory rather than mandatory because they exist for the assurance of the prompt resolution of child custody matters rather than as a jurisdictional prerequisite to custody determinations, the remedy for a party aggrieved by a judge's delay is to petition an appellate court for a writ of procedendo to compel the execution of his statutory duty.[19] Failure to do so at the trial level constitutes a waiver of that issue for purposes of appeal.[20] Because no such application was made, this assignment of error has no merit.
 VI. WHETHER THE COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
According to R.C. 2151.414(B)(1):
 Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 (a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
(b) The child is abandoned.
 (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
 (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.
A judge is required to analyze whether permanent removal of a child from the home of a natural parent is in the child's best interest using, without limitation to other relevant factors as each case may present, the following criteria:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 (5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
 For the purposes of this division, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.[21]
Clear and convincing evidence is that measure or degree of proof which is more that a mere `preponderance of the evidence,' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.[22]
A determination of whether something has been proven by clear and convincing evidence will not be disturbed on appeal unless such determination is against the manifest weight of the evidence. If a burden of proof must be met with clear and convincing evidence, a reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy that burden of proof.[23]
The journal entry, sub judice, vested permanent custody of the children in CCDCFS, in part, because neither could be placed with his or her father within a reasonable time. While we hold that no such determination is called for in this case, we note that the judge failed to address the requirements of R.C. 2151.419, which provides:
 * * * [A]t any hearing held pursuant to section 2151.28, division (E) of section 2151.31, or section 2151.314
[2151.31.4], 2151.33, or 2151.353 [2151.35.3] of the Revised Code at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency or private child placing agency that filed the complaint in the case, removed the child from home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home. The agency shall have the burden of proving that it has made those reasonable efforts. * * * In determining whether reasonable efforts were made, the child's health and safety shall be paramount.[24]
Seese contends CCDCFS, by failing to cooperate with him in finding recommended therapy providers, and in frustrating his attempts to comply with his drug and alcohol assessment requirement, set him up to fail his case plan objectives. We do not agree. The establishment and monitoring of a case plan to reunite a child with its parent is not equivalent to giving a parent a set of educational or life-situation goals which, once completed, would automatically entitle the parent to a return of a child. Case plans include not only the improvement of the prospective home environment from a parent's point of view, but also represent an attempt to construct a home environment conducive to a child's health and safety.
It is apparent that B.S. needed, and still requires, significant psychological treatment in order to deal with the effects of his earlier home life. The case plan set up by CCDCFS included not only therapy for Seese but for the child as well. It is abundantly clear that separating the child from his sister or his foster parents and forcing him to live with a man he will not speak of and really does not know could never contribute to his health and safety. Indeed, the evidence overwhelmingly points to the contrary. While Seese may not have personally created the chaos that has been so damaging to his son, he cannot pretend to ignore its effects and the bare fact that he acquiesced to his wife's keeping the child in that environment because of his inaction and passivity. While it is true that considerations of whether a child could enjoy a better material environment in foster care than with a natural parent do not control,[25] the evidence revealed that Seese could not manage his own affairs or hold a job for his own benefit, much less care for a young son while meeting these basic life responsibilities.
The determination made by the judge under the criteria set forth in R.C. 2151.414(D) supports a conclusion that permanent placement of B.S. with CCDCFS is in his best interests, not a determination that he cannot be placed with his father in a reasonable amount of time, as the journal entry so indicates. Even so, we find that given the evidence presented, the judge sufficiently complied with the mandates of R.C. 2151.414 in determining that B.S.'s best interests dictate permanent placement with his foster parents.
At the hearing, it was conclusively established that B.S. regards the foster family and his siblings as his family, and that permanent placement with them is crucial in helping him to combat the severe psychological problems caused by his home life prior to his emergency and temporary placement in foster care. The evidence also established that he has no relationship with his father and does not even wish to discuss him with his therapist or foster mother.
B.S. was taken into emergency custody on October 14, 1998 and has been living with his foster family continuously since, including March 23, 2000, when CCDCFS moved for permanent custody. Under R.C.2151.414(B)(1)(d), in effect since March 1999, if a child has been in the custody of CCDCFS for no less than twelve of the last twenty-two months — here it was seventeen continuous months — and it is determined by clear and convincing evidence that permanent placement with the agency is in the child's best interest under R.C. 2151.414(B)(1), a judge may properly award permanent custody to the agency under R.C.2151.414. It was not necessary to determine whether the child could or should be placed with a natural parent under R.C. 2151.414(E).
Although we find merit in Seese's second, third, fourth, fifth and seventh assignments of error that challenged the admission of evidence supporting allegations of his being a child abuser, we note that the judge stated on the record at the conclusion of the hearing that he did not find Seese to have engaged in any inappropriate conduct with either E.M. or his son. Moreover, the journal entry makes no reference to any allegations of sexual misconduct as a ground for permanent placement of B.S. with CCDCFS but, rather, is based upon other factors. Further, while the judge did ignore R.C. 2151.419 in failing to address the adequacy of Seese's case plan, the record permits only the conclusion that removal from Seese's custody is B.S.'s only real option. We, therefore, find the errors harmless and affirm the judgment.
The journal entry appealed from, however, is fatally flawed because it purports to grant permanent custody to CCDCFS under R.C. 2151.414(B)(1)(a) when the evidence supports such custody under R.C. 2151.414(B)(1)(d).
We remand the matter for clarification of those factors or criteria upon which the judge based his order granting permanent custody. We stress that our remand of this case only calls for clarification of the final journal entry as it pertains to Seese and B.S., inasmuch as E.M.'s father did not appeal.
Judgment affirmed but case, in part, remanded for clarification of the journal entry.
It is ordered that the appellees recover from the appellant costs herein taxed.
This court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
KENNETH A. ROCCO, P.J., and FRANK D. CELEBREZZE, JR. J., CONCUR.
[1] A daughter, E.M (DOB: September 30, 1994), and sons J.O and A.O. These sons have been permanently placed with unidentified foster parents and are not involved in these proceedings.
[2] There was also apparently an unspecified allegation of sexual abuse of E.M. being investigated by different CCDCFS personnel.
[3] Mrs. Seese and Fasone had a daughter, N., born in June of 1999 who was placed with the same family, and remains there to date as well.
[4] The first attempt of December, 1998 was not accepted because the record of the assessment had somehow been lost until mid-1999, at which point CCDCFS considered it stale; the second attempt was Seese's submission of a job-related urinalysis which the agency deemed insufficient.
[5] See Evid.R. 103(A)(1); In re Goolsby (Apr. 19, 2001), Cuyahoga App. Nos. 78014 and 78015, unreported.
[6] Evid.R. 801(C).
[7] Evid.R. 802.
[8] Evid.R. 807(C); See also In re Reeves (Jun. 7, 2000), Summit App. Nos. 19650, 19669, 19672, 19673, 19674, 19705, 19706, 19707, unreported, relying on In re Coy (1993), 67 Ohio St.3d 215, 616 N.E.2d 1105.
[9] State v. Byrd (1987), 35 Ohio App.3d 100; 519 N.E.2d 852.
[10] R.C. 149.43(A)(1).
[11] State, ex rel. Martinelli v. City of Cleveland Police Department (Apr. 22, 1991), Cuyahoga App. No. 56461, unreported, relying on State, ex rel. National Broadcasting Company, Inc. v. City of Cleveland (1991),57 Ohio St.3d 77, 566 N.E.2d 146.
[12] In re Breslav (Apr. 13, 2000), Cuyahoga App. No. 75468, unreported; see, also, In the Matter of Malone (May 11, 1994), Scioto App. No. 93CA2165, unreported.
[13] In reality, the report was not filed until January 16, 2001, the same day the final order disposing of this case was entered.
[14] In re Benoit (Nov. 2, 2000), Cuyahoga App. No 76128, unreported; In re Breslav (Apr. 13, 2000), Cuyahoga App. No. 75468, unreported; In re Marie K. (Jun. 8, 2001), Lucas App. No. L-01-1036, unreported.
[15] (1995), 106 Ohio App.3d 813, 667 N.E.2d 431.
[16] Id. at 819-820, 667 N.E.2d at 435.
[17](1996), 76 Ohio St.3d 632, 669 N.E.2d 1140.
[18] Id. at 636-637, 669 N.E.2d at 1143-1144.
[19] See In re Davis (1999), 84 Ohio St.3d 520, 705 N.E.2d 1219, dealing specifically with the requirement in R.C. 2151.35(B)(3) that orders determining permanent custody under R.C. 2151.414 must be entered within seven days of the conclusion of the hearing.
[20] Id. at 524, 705 N.E.2d at 1223.
[21] R.C. 2151.414(D)
[22] Cross v. Ledford (1954), 1612 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus; In re Adoption of Holdcomb (1985),18 Ohio St.3d 361, 368, 481 N.E.2d 613, 620.
[23] In re Adoption of Holdcomb, supra.
[24] R.C. 2151.419
[25] In re Lay (1987), 43 Ohio App.3d 78, 82, 539 N.E.2d 664,669.